## ROGERS v. SILVER FLEET SYSTEM OF MEMPHIS et al.

### No. 1833.

Court of Appeal of Louisiana. First Circuit.
April 7, 1938.

Porteous, Johnson & Humphrey, of New Orleans, for appellants.

Ponder & Ponder, of Amite, for appellee.

OTT, Judge.

This suit grows out of a collision of two freight trucks on the paved highway No. 51 near Velma in Tangipahoa parish, about 2:30 o'clock on the morning of December 29, 1936. Plaintiff alleges that he was driving a truck of the Hester Truck Lines, Inc., going south on the above highway, and a truck of the Silver Fleet System of Memphis was being driven north on said highway, and that this Silver Fleet truck was traveling in the center of the road, straddling the center black line; that said Silver Fleet truck had no lights, or lights so dim that they would not penetrate the thick fog or mist then prevailing; that he, plaintiff, was driving his truck on his right side of the road and saw the Silver Fleet truck coming 100 or more feet ahead; that he sounded his horn, applied his brakes, and pulled his truck over to his right, partly off the pavement; that the driver of the Silver Fleet truck continued in the center of the road, and pulled his truck diagonally across the road and ran into the side of plaintiff's truck, the left front wheel and fender of the Silver Fleet truck striking about the door of plaintiff's tractor and the front side of the trailer attached to the tractor, completely demolishing the tractor and practically demolishing the trailer.

Plaintiff alleges that when he first saw the Silver Fleet truck approaching him, he was traveling from 25 to 30 miles per hour; that he began to slow down, and when the collision occurred, he had practically stopped, almost off the pavement on his side of the road; that the Silver Fleet truck was going from 45 to 50 miles per hour. Plaintiff further alleges that he was thrown out of his truck, and received severe cuts and bruises over his right temple, his head, right ear, right shoulder and upper right arm; that some of these injuries are permanent, leaving scars and causing disfigurements on his person. He claims $3,000 for personal

injuries and $385 for medical expenses and loss of salary; a total of $3,885.

The Central Surety & Insurance Corporation is joined in the suit as the carrier of liability insurance for the Silver Fleet System, and a judgment is asked for against it also.

The Hester Truck Lines, Inc., filed a separate suit against these same defendants asking for damages to its truck and trailer, loss of the freight cargo, and for the loss of the use of the truck and trailer; a total of $1,628.09. The same acts of negligence are charged against the driver of the Silver·Fleet truck as were made by Rogers in his suit, and the two suits were consolidated for trial, but separate judgments rendered in each.

In each suit defendants denied any negligence on the part of the driver of the Silver Fleet truck, and denied that the Silver Fleet System owned the truck involved in the accident, and denied that the driver of that truck was in the employ of the Silver Fleet System. In the alternative, defendants aver that, if there is any liability on their part, they allegé contributory negligence on the part of Rogers, or the driver of the Hester truck, as the sole cause of the accident. They allege that this contributory negligence consisted in the driver of the Hester truck proceeding south in a heavy fog at a speed of approximately 45 miles per hour; that the Hester truck, a short time before the accident, was being driven on the left side of the road, even over on the left shoulder, and, at the time of the accident, was proceeding on its left side of the center line, at a fast rate of speed, without lights; that at the time of the accident, Rogers was not driving the Hester truck, but that another man in the truck with him was driving; that, whoever was driving the truck, whether Rogers or the other man, was under the influence of liquor and was driving in a reckless and dangerous manner.

Judgment was rendered in favor of Rogers for $1,809.50, and in favor of the Hester Truck Lines, Inc., for the sum of $1,375.-42. The defendants have appealed from both judgments, and the two cases were consolidated in this court for the purpose of argument and submission. Motions have been filed in this court by both plaintiffs asking that the amount of the judgments be increased to the sum asked for in the petitions in each case.

After the cases were argued and submitted in this court, counsel for the plaintiffs filed a motion to supplement the transcripts by filing therein the written reasons for judgment given by the trial judge. We find from the minutes that judgment was rendered in open court on June 30, 1937, with the notation that written reasons were to be filed in the record. These reasons were not filed in the record before the transcripts were lodged in this court. The cases were argued in this court on March 8, 1938, and submitted on the same day. If we should grant this motion and permit these reasons for judgment to be filed in the transcripts, it would necessitate a reargument and resubmission of the cases as counsel for defendants would have a right to examine and oppose these written reasons assigned by the trial judge. Such a procedure would be irregular and, in these cases at least, unjustified. We are always glad to have the benefit of the written reasons assigned by the trial judge, particularly where issues of fact are principally involved; but, in view of the conclusions we have reached in these cases, we do not feel that the situation is such as to justify a departure from the usual and regular procedure in cases on appeal to this court. For these reasons, the motion to supplement the transcripts with the written reasons of the trial judge is hereby refused.

Rogers was on his way to New Orleans with a cargo of bottles. At Hazlehurst, Miss., he picked up a young man named Henry Mangold, and they left that point about 9:30 p. m. on the night of the accident. They stopped at a place called Ollie's Tavern a short distance north of Brookhaven, and stayed there several minutes. Several witnesses were produced by defendants in an effort to show that these two boys drank beer and other intoxicating liquors while at this place, and that they were under the influence of liquor when they came there. Without undertaking to detail this evidence, suffice it to say that the gist of it was to the effect that Rogers drank a glass of beer and went on the outside and sat in a car for a few minutes with a friend, to which car several bottles of 7 Up were served presumably as chasers for hard liquor which it is sought to be inferred that Rogers and his friend drank. Both Rogers and Mangold denied that they drank any intoxicating liquors that night.

Another boy, Bill Baggett, was picked up at Brookhaven. They stopped at another place in or near Brookhaven called the 777 Service Station for the purpose of unloading a drum of oil. The keeper of that sta-

tion and a negro working there testified for defendants to the effect that these two young men acted like they had been drinking, and when they drove off, the truck zigzagged across the street and picked up speed quickly. The three young men stopped at McComb for several minutes and drank coffee and Coca-Cola. They left McComb around or shortly after 1 o'clock. The testimony of Rogers and Mangold as to what happened after they left McComb is substantially as follows:

The fog was heavy and got thicker as they proceeded south; Rogers was driving; Bill Baggett was in the middle and went to sleep soon after they left McComb; Mangold was on the right-hand side; when they got within a hundred feet or so from the Silver Fleet truck, they saw it coming up the center of the road without lights; Rogers was driving on his side of the road, blew his horn, and, when within 30 or 40 feet of the approaching truck, pulled further to his right, so that a part of his truck was on the shoulder of the road on the right side, and the trailer barely missed a culvert on that side; that as Rogers began to pull over to his right, he slowed down and almost came to a stop; that the Silver Fleet truck came almost diagonally across the road and hit the left front fender of the Hester truck, severing the tractor from the trailer, turning over the tractor and throwing the trailer over onto the shoulder of the road and the bottles being scattered mostly in the ditch on the right-hand side. They say that Rogers was driving between 20 and 30 miles per hour when they first saw the Silver Fleet truck, and that Rogers then began to slow down. Both say that Bill Baggett was asleep when the collision occurred.

Bill Baggett was called as a witness by the defendants. He admitted that he did not see either Rogers or Mangold drink any intoxicating liquor that night, nor could he say positively that he smelled any liquor on Rogers, but that Rogers did tell him that he (Rogers) had taken a drink that night as he had a sore throat. Baggett testified that Rogers drove to McComb where they stopped, and after they left that point, Mangold drove; that he (Baggett) was sitting in the middle and Rogers was on the right side; that he (Baggett) went to sleep when about 8 or 10 miles out of McComb, and did not wake up until the accident had happened; that as they were getting out of the wreck Rogers, who was bleeding and excited, said: "Listen, boys, remember I was driving this truck"; that both Rogers and Mangold at that time stated that they did not know how the wreck happened.

The driver of the Silver Fleet truck was killed in the accident, and, of course, he could not be present to tell his side of the tragic occurrence. No one else saw the accident other than Rogers and Mangold, Baggett being asleep when it occurred; but a number of witnesses were produced by both sides to show the condition of the truck and the physical signs at the scene of the accident after it happened.

But before discussing this physical evidence, we will make the observation that, from a careful study of the evidence, we do not think that Rogers was drinking, or that he was under the influence of intoxicating liquors to the extent that his ability to drive the truck was affected. Without analyzing the voluminous testimony on this point, two factors alone would suffice to justify this conclusion; first, the fact that defendants' own witness, Bill Baggett, did not testify that Rogers was drunk, notwithstanding the fact that Baggett and Mangold were in a better position to know whether or not Rogers was under the influence of liquor than anyone else; and, second, if Rogers had been drinking before he reached Brookhaven, or drank before leaving there, some four or five hours had elapsed before the accident, and it is not probable that he would have then been under the influence of liquor, conceding that he had taken a drink at Brookhaven, or before reaching that point, and it is conceded that he drove the truck for quite a time after leaving Brookhaven. When these corroborating circumstances are taken into consideration, the testimony of Rogers and Mangold to the effect that Rogers was not under the influence of liquor that night has not been overcome by the evidence produced by defendants on this point.

It is also well to observe at this point that after the judgments were rendered, Mangold undertook to repudiate the testimony he had given at the trial on practically all material points. He volunteered to go to New Orleans to see defendants' counsel and make a statement. The statement was made in the presence of one of defendants' counsel, an insurance adjuster, and the court stenographer, but Mangold refused to sign this statement and refused to swear to it. His expenses were paid to New Orleans, and on the basis of this statement by Mangold defendants filed suits to annul both of

the judgments on the ground that they had been rendered on the false testimony of Mangold and Rogers. These suits for the annulment of the judgments were tried and in connection therewith the testimony of Mangold was again taken, and, in this deposition, testified practically the same as he had on the trial of the cases and reaffirmed the testimony that he had previously given. In explanation of the contradictory statement that he gave in New Orleans, he said that he was under the influence of liquor at the time he gave that statement, and that what he said at that time was not true, but that the testimony which he gave in the trial of the suits was true and correct. The trial court refused to annul the judgments, and defendants in the present suit, plaintiffs in the suit to annul, have taken an appeal from these judgments also and they have been consolidated with the present suits to which they relate.

Without giving any weight to the testimony of Mangold, there would still be sufficient evidence in the record for us to believe, as no doubt the trial judge believed, that Rogers was driving the truck at the time of the accident, and not Mangold. In addition to the testimony of Rogers on this point, a young lady who worked in the restaurant at McComb where the three men stopped, testified that when the truck left there Rogers was driving. Furthermore, the fact that Rogers got the cuts on his face and arm rather indicates that he was on the side of the truck where the impact took place—that is, near the running board or door of the cab on the left side.

The sheriff, the coroner, several highway policemen, and other disinterested witnesses testified that they saw the position of the trucks shortly after the wreck, and that the Hester truck was on its side of the road, almost entirely off the pavement, the tractor severed from the trailer and turned over, and the trailer was also over on the right shoulder of the road, with much of the cargo scattered over in the ditch on that side. The Silver Fleet truck was diagonally across the pavement, the front part headed in a northwesterly direction, across to its left of the center line, with the back wheels of the trailer almost straddling the center line of the road, or at least with the left rear wheel slightly over the black line. The body of the driver of the Silver Fleet truck was lying under the van of the Silver Fleet truck, slightly to the left of the center line. All of the physical facts indicate clearly that the impact took place on the west side of the road, which was on the side the Hester truck would properly travel, and the wrong side for the other truck to be on.

The physical facts show that the Hester truck was struck on its left side toward the front. This indicates that the other truck ran into this side of the Hester truck, and the damage done to the Silver Fleet truck on its left side strengthens this conclusion.

Defendants make the contention that the Hester truck, before meeting the Silver Fleet truck, was being driven on its left side of the road, going for some distance on the left shoulder; that the driver of the Hester truck, when he saw the other truck approaching, cut across to his right in order to get on the right side of the road, and, in doing so, ran in front of the Silver Fleet truck. If the testimony justified this contention, we would not only say that the driver of the Hester truck is not entitled to recover damages, but also that he was guilty of criminal negligence. But defendants have failed to prove that the driver of the Hester truck was guilty of such gross negligence.

Two witnesses who were at the scene the day following the accident, testified that they found the tracks of a truck with dual tires on the east side of the road, partly on the shoulder, from some hundred or more feet north of the point of collision extending down to near a culvert a few feet north of the point of collision; that this track then led across the road to the right or to the west toward the place where the Hester truck was found after the collision. One of these witnesses, who qualified as an expert in estimating damages to wrecked cars, attempted to assemble all the facts shown from the signs and wrecked trucks, and then gave his opinion as to how the accident happened; his opinion being that the Hester truck came from its left side of the road diagonally across to the right, and was struck by the other truck as it attempted to make this crossing in front of the on-coming Silver Fleet truck.

In our opinion, the theory advanced by this expert as to the manner in which the accident occurred is rendered improbable, if not impossible, by another fact which he admits that he is not able to explain. That is the fact that the Hester truck stopped while headed in a southerly direction, with its front part practically past the rear of the other truck. It is impossible to conceive of this Hester truck getting in that position if it was crossing the road toward the west

side when struck from the south by the other truck; the natural tendency of the force would have been to throw the Hester truck toward the northwest, and there is no reasonable theory by which it could have almost passed the Silver Fleet truck headed toward the south.

Nor are we disposed to attach any great deal of importance to the fact that there were tracks of dual truck wheels on the east side of the road, north of the point of collision. Numerous cars passed the wreck on the east side of the Silver Fleet truck, and while these tracks were north of the culvert, many cars and trucks doubtless pulled over to that side of the road before reaching the culvert as is usual in a traffic congestion as must have occasionally presented itself before the wrecks were removed; in fact, we infer that such was the situation from the testimony of many witnesses who were there after the wreck. Moreover, there is some testimony by some of the witnesses that, shortly after the accident, they traced the tracks of the Hester truck going off the pavement on the west side, coming from the north and running in a southwesterly direction diagonally off the pavement.

Without giving any consideration to the testimony of Mangold, we think that the physical facts corroborate the testimony of Rogers as to the manner in which the accident happened. Nor do we find that the defendants have proved, in fact have offered little if any testimony to prove, that Rogers was driving at an excessive rate of speed, or that he was driving without lights and without keeping a proper lookout. The responsibility for the deplorable accident must be placed on the unfortunate driver of the Silver Fleet truck.

It is alleged in the petition that the Silver Fleet System operates a freight truck which traverses highway 51 in Tangipahoa parish. Answering this paragraph, defendants admit that the Silver Fleet System operates a truck line, but they deny that it owned or operated the truck involved in the accident, or that the driver was in its employ. Under this allegation defendants offered evidence to show that the truck belonged to one S. H. Williams who employed the driver and operated the truck as an independent contractor for a specified amount for each trip.

Having undertaken to show that Williams was an independent contractor, the burden rested on defendants to prove this fact. Taylor v. Victoria-Nav. Company et al., La.App., 176 So. 519; E. C. Taylor Company v. New York & Cuba Mail S. S. Co., 159 La. 381, 105 So. 379. They have failed to meet that burden.

The Silver Fleet System runs a regular freight service from New Orleans to Jackson and Memphis. It has freight bills with its name printed thereon; it also owns trucks, painted a silver color, with the name conspicuously written on the side, "Silver Fleet System." The drivers of these trucks collect freight for the System and sign receipts on the freight bills. The drivers have signs on their uniforms designating them as Silver Fleet Drivers. The System operates terminals where the freight is loaded onto and from the trucks.

It is true the evidence shows that the particular truck involved in this accident was purchased by Williams, assessed to him, and the license issued in his name. Williams testified that he operated this truck for the Silver Fleet for $40 a trip to Jackson, and that he paid all expenses, including gas, upkeep of the truck, and salary of the driver. But the evidence also shows that this truck was identical in color and appearance to that of the Silver Fleet trucks, with the name, "Silver Fleet System" printed on its side in the same manner as all of the Silver Fleet trucks. The truck was loaded at the Silver Fleet terminal by employees of the System, and ran on a schedule fixed by the System, and the truck was sent out when and as required by the System on one of these regular schedules. The freight carried in the truck was carried for the Silver Fleet, which collected the freight through the driver of the truck.

Moreover, the Silver Fleet admitted in its answer that it carried liability insurance on the truck, and the cargo of freight in the truck was insured by the Silver Fleet and not by Williams. The direction and control of the route, the fixing of the schedule, and the general operation of this freight business was under the control of the Silver Fleet, and it cannot escape liability for the negligence of the driver of the truck while engaged in serving the System in connection with this freight business no more than it could escape liability for the negligence of one of its drivers in failing to deliver or damaging freight carried for hire.

Plaintiff, Rogers, incurred doctor's bills in the sum of $32, and a hospital bill in the sum of $7.50, on account of the injury. He also lost in salary the sum of $270. This

**450**

makes a total loss outside of the physical injuries suffered of $309.50.

While we do not have the benefit of the reasons given in fixing the damages by the trial judge, we assume that he must have allowed the above items and the additional sum of $1,500 for physical injuries, as the total award was $1,809.50. The principal injury sustained by plaintiff was a cut over his right eye. This cut has left a permanent scar, some two inches long, and the muscle that controls the eyelid over this eye seems to be impaired to some extent, but not to the extent of impairing his vision. He also sustained a rather severe cut in the scalp and on his shoulder and arm which left some scars, but not of a noticeable nature. We think for the cuts and bruises, pain and suffering and scars, that a total award of $1,500 made by the trial judge is sufficient. We see no good reason to increase the award or reduce it.

For the reasons assigned, the judgment of Grady Rogers against the Silver Fleet System of Memphis, Inc., and the Central Surety & Insurance Corporation, herein appealed from, be, and the same is hereby, affirmed at the cost of the appellants.